## BERWIND CORPORATION

v.

Kenneth S. APFEL, United Mine Workers of America Combined Benefit Fund, Michael H. Holland, William P. Hobgood, Marty D. Hudson, Thomas O.S. Rand, Elliot A. Segal, Carl E. Van Horn, Gail R. Wilensky, as Trustees of the United Mine Workers of America Combined Benefit Fund, the United States of America, the United Mine Workers of America 1992 Benefit Plan and Michael H. Holland, Marty D. Hudson, Elliot A. Segal, A. Frank Dunham, as Trustees of the United Mine Workers of American 1992 Benefit Plan.

No. CIV.A. 98–5985.

United States District Court, E.D. Pennsylvania.

March 31, 2000.

Arthur Newbold, Andrew S. Miller, Dechert, Price and Rhoads, Philadelphia, PA, for Berwind Corp., Plaintiff.

Marcia K. Sowles, Department of Justice, Washington, DC, for Kenneth S. Apfel, Commissioner of Social Security, The United States of America, Defendants.

Peter Buscemi, Morgan, Lewis & Bockius, Washington, DC, Jami Wintz Mc Keon, Morgan, Lewis & Bockius LLP, Philadelphia, PA, for united Mine Workers of America Combined Benefit Fund, Michael H. Holland, William P. Hobgood, Marty D. Hudson, Thomas O. S. Rand, Elliot A. Segal, Carl E. Van Horn, Gail R. Wilensky, As Trustees of the United States Mine Workers of America Combined Benefit Fund, Defendants.

Jami Wintz Mc Keon, Morgan, Lewis & Bockius LLP, Philadelphia, PA, for the United Mine Workers of America 1992 Benefit Plan, Defendant.

## MEMORANDUM

WALDMAN, District Judge.

### I. *Introduction*

Plaintiff is a corporation which was previously engaged in the coal mining business. It was a signatory to collective bargaining agreements with the United Mine Workers of America ("UMWA") in the 1950s and early 1960s. Plaintiff was assigned responsibility under the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act") to fund lifetime health benefits for retired members of the UMWA and certain of their dependents.

Defendant Apfel is Commissioner of Social Security. As such, he is responsible for assigning beneficiaries to operators which are then required to make premium payments to the UMW Combined Benefit Fund ("Combined Fund") and 1992 Benefit Plan ("1992 Plan"), entities created or reconfigured by the Coal Act.

Defendants Holland, Hobgood, Hudson, Rand, Segal, Van Horn and Wilensky are trustees of the Combined Fund. Defendants Holland, Hudson and Segal are also trustees of the 1992 Plan as is defendant Dunham.

In Counts I and II Berwind respectively seeks declarations that the application of the Coal Act by the Commissioner to assign responsibility for beneficiaries to plaintiff pursuant to § 9706(a)(3) violates the Due Process Clause and the Takings Clause of the Fifth Amendment. In Count III, plaintiff asserts that "the entire Coal Act must be invalidated as unconstitutional" because "Congress would not have enacted the Coal act without Section 9706(a)(3)." In its prayer for relief, however, plaintiff does not actually request a declaration that the Coal Act is unconstitutional.

In Count IV, plaintiff asserts a claim pursuant to the Coal Act, 26 U.S.C. § 9706(f)(3), for a refund of premiums for assigned Combined Fund beneficiaries which the Commissioner refused to withdraw and Combined Fund trustees refused to return following a Supreme Court decision that application of the Act to an entity similarly situated to plaintiff was unconstitutional.

In Count V, plaintiff asserts a claim under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). Plaintiff alleges that the Commissioner acted arbitrarily, capriciously and inconsistently with the law and abused his discretion when he declined to void Berwind's assignments while doing so for similarly situated companies following that Supreme Court Decision. Berwind seeks an order setting aside that decision.

In Counts VI, VII and VIII, Berwind asserts alternative claims to recover pre-

miums it has paid since April 4, 1995 to the Combined Fund and 1992 Plan ("the Funds"). In Count VI, plaintiff asserts a federal common law claim for restitution for these premiums. In Count VII, plaintiff seeks a refund of these premiums under ERISA. In Count VIII, plaintiff seeks a refund from the United States pursuant to 26 U.S.C. § 7422 of any Combined Fund premiums plaintiff is unable to obtain from the Fund. In a prayer for relief section, plaintiff also seeks to enjoin the Commissioner and the United States from applying the Coal Act to Berwind and to enjoin the Funds from assessing or attempting to collect outstanding premiums.

The Funds and their trustees ("the Trustees") have asserted several corresponding counterclaims. In Count I, they seek a declaration that the Coal Act is constitutional as applied to Berwind.[1] In Count II, they seek to recover under ERISA from Berwind unpaid premiums for assigned Combined Fund beneficiaries since July 1998. In Count III, they seek the same regarding the 1992 Plan. In Count IV, they seek payment of current assessed premiums and to enjoin Berwind from disposing of assets until it satisfies all obligations to the Funds or from failing to comply with future Coal Act obligations.

All defendants assert that plaintiff's claims are barred by res judicata and collateral estoppel as a result of a judgment rendered on April 4, 1995 in a prior lawsuit in the Northern District of Indiana in which plaintiff asserted a similar challenge to the constitutionality of the Coal Act as applied.

Plaintiff has filed a motion for summary judgment on its Fifth Amendment claims in Counts I and II. The Commissioner and

the United States (the "federal defendants") have filed a motion for summary judgment on plaintiff's claims. The Trustees have filed a motion for summary judgment on their counterclaims.[2]

## II. *Legal Standard*

In considering each motion for summary judgment, the court determines whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Arnold Pontiac–GMC, Inc. v. General Motors Corp.*, 786 F.2d 564, 568 (3d Cir.1986). Only facts that may affect the outcome of a case are "material." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. All reasonable inferences from the record are drawn in favor of the non-movant. *Id.* at 256, 106 S.Ct. 2505.

Although the movant has the initial burden of demonstrating the absence of genuine issues of material fact, the non-movant must then establish the existence of each element on which it bears the burden of proof. *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir. 1990) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert. denied*, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991). A plaintiff cannot avert summary judgment by resting on the allegations in his pleadings, but rather must present competent evidence from which a fact-finder could reasonably find in his favor. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172

---

1. The Trustees submit a draft order with a proposed declaration that the Coal Act "is constitutional on its face and as applied to plaintiff." In the actual counterclaim, however, the prayer for relief is specifically limited to a request for a declaration that the Act "as applied to Counterclaim Defendant Berwind does not violate the Due Process or Takings Clauses."

2. The Trustees have not moved for summary judgment on plaintiff's claims against them. The Trustees' motion concludes with a request only that the court "deny Berwind's motion" and "enter judgment [for the Trustees] on their counterclaims."

F.3d 238, 252 (3d Cir.1999); *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir.1989); *Woods v. Bentsen*, 889 F.Supp. 179, 184 (E.D.Pa.1995).

### III. *Facts*

While the parties obviously disagree on the ultimate conclusions to be drawn, they do not disagree about what relevant facts are established on the record presented. These uncontroverted facts and the pertinent history are as follow.

#### The Coal Act

Following a nationwide strike in 1946, the UMWA and the Bituminous Coal Operators' Association ("BCOA"), a multi-employer group of coal producers, executed the first National Bituminous Coal Wage Agreement ("NBCWA"). The 1947 NBCWA specified terms and conditions of employment in the mines and provided health and pension benefits to miners.

A new NBCWA was signed in 1950 which provided that the BCOA would create a welfare and retirement fund financed by a per ton levy on coal mined by signatory coal producers. The 1950 Fund was designed to receive employer contributions and to use the funds to provide health benefits to current and retired miners and, in certain cases, family members. Additional NBCWAs were signed over the next twenty years.

Following the passage of ERISA, the 1950 Fund was restructured in 1974. The 1974 NBCWA created four separate multiemployer plans, two covering pension benefits and two dealing with non-pension benefits. The latter were the 1950 Benefit Plan which provided health benefits to coal workers who retired prior to 1976, and the 1974 Benefit Plan which covered those who retired on or after January 1, 1976. The 1974 NBCWA guaranteed that miners and their dependants would retain their health benefits "for life."

The 1978 NBCWA incorporated a new provision to ensure health care for "orphaned" miners, those whose employers had abandoned the coal industry, as well as "guarantee" and "evergreen" provisions to ensure the solvency of the Plans. The "guarantee" clause obligated signatories to make sufficient contributions to maintain benefits at the negotiated levels during the period of the agreement. The "evergreen" clause required signatories who continued to mine coal to make benefit contributions for as long as such contributions were required by future NBCWAs, regardless of whether a particular operator actually signed the subsequent agreements. The 1978 NBCWA shifted responsibility for miners leaving covered service on or after January 1, 1976 from the UMWA multiemployer system to individual coal companies, with the 1974 Plan reserved as an "orphan" plan for retirees whose former employers went out of business.

The Plans were plagued by economic problems. By 1990, the 1950 and 1974 Benefits Plans had incurred a deficit of $110 million. The Secretary of Labor set up the Coal Commission to find a way to reinvigorate the Plans to ensure that retirees would continue to receive their health benefits.

In response to the Coal Commission's report, Congress enacted the Coal Act. Effective July 20, 1992, the Act combined the 1950 and 1974 Plans into a single plan called the United Mine Workers of America Combined Benefit Fund ("Combined Fund"). *See* 26 U.S.C. § 9702(a)(2). The Combined Fund was meant to ensure that all retirees who were eligible to receive health benefits from the preexisting Plans would obtain them from the Combined Fund. It encompasses persons who were receiving benefits as of July 20, 1992 under the 1950 or 1974 Plans.

The Coal Act also created the United Mine Workers of America 1992 Benefit Plan ("1992 Plan"). *See* 26 U.S.C. § 9712. The 1992 Plan was designed to provide benefits to eligible retirees and their dependants who were not beneficiaries of the Combined Fund. *See* 26 U.S.C. § 9712(b)(1). The 1992 Plan is limited to individuals who retired on or before September 30, 1994. The 1992 Plan thus en-

compasses persons who retired between July 21, 1992 and September 30, 1994.

The Coal Act directs the Commissioner to assign each coal industry retiree who is an eligible beneficiary to a signatory operator or any "related person." *See* 26 U.S.C. § 9706(a). "Signatory operator" means a person who signed any NBCWA or other agreement requiring contributions to the 1950 or 1974 Benefit Plans. *See* 26 U.S.C. § 9701(c)(1). Any signatory operator who "conducts or derives revenue from any business activity, whether or not in the coal industry," may be liable for those premiums. *See* 26 U.S.C. § 9706(a); § 9701(c)(7). Where a signatory is no longer involved in any business activity, premiums may be levied against a "related person." Whether companies are "related persons" is determined as of July 20, 1992. *See* 26 U.S.C. § 9701(c)(2)(B).[3]

The Commissioner assigned eligible beneficiaries to particular signatory operators or related persons as prescribed by the Coal Act. The assignments are adjusted with the beginning of a new "plan year" each October 1st. Annual premiums are calculated for each plan year and then due on a monthly basis.

Assignments are made:

(1) First, to the signatory operator which—

(A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

(B) was the most recent signatory operator to employ the coal industry retiree in the coal industry for at least 2 years.

(2) Second, if the retiree is not assigned under paragraph (1), to the signatory operator which—

(A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

(B) was the most recent signatory operator to employ the coal industry retiree in the coal industry.

(3) Third, if the retiree is not assigned under paragraph (1) or (2), to the signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement.

26 U.S.C. § 9706(a).

Eligible beneficiaries who are not otherwise assignable under the Act receive benefits from a pool of reserved funds or, if necessary, from premiums assessed proportionately against all assigned operators. *See* 26 U.S.C. § 9704(a)(3) & (d). It has been unnecessary to date to assess any such premiums.

### *Berwind*

Under the Coal Act, Berwind has been assigned Combined Fund and 1992 Plan beneficiaries. It is now responsible for monthly premium payments totaling more than $295,000 for 1,209 Combined Funds beneficiaries and monthly premiums of $567 for several 1992 Plan beneficiaries. Except for five Combined Fund beneficiaries, these assignments have been on the basis of prior employment of the beneficiaries by the Berwind–White Coal Company.

---

3. The Act defines related persons as follows:
 (A) In general—A person shall be considered to be a related person to a signatory operator if that person is—
 (i) a member of the controlled group of corporations (within the meaning section 52(a) [of the Internal Revenue Code]) which includes such signatory operator;
 (ii) a trade or business which is under common control (as determined under section 52(b) [of the Internal Revenue Code]) with such signatory operator; or

(iii) any other person who is identified as having a partnership interest or joint venture with a signatory operator in a business within the coal industry, but only if such business employed eligible beneficiaries, except that this clause shall not apply to a person whose only interest is as a limited partner.
A related person shall also include a successor in interest of any person described in clause (i), (ii), or (iii).
26 U.S.C. § 9701(c)(2)(A).

Berwind–White changed its name to the Berwind Corporation on January 2, 1967. Berwind–White terminated coal mining operations in June 1962. Berwind–White was a signatory to the 1950 NBCWA as well as the 1951, 1952, 1955, 1956 and 1958 amendments. The Berwind Corporation has invested in a variety of businesses since 1962 and thus conducts business activity as defined by the Coal Act.

On January 31, 1963, Berwind–White acquired 98% of the shares of Reitz Coal Company ("Reitz") and later became sole shareholder. Reitz was an independent coal company with its own mines. Following the acquisition, it did not take over any of Berwind's mines which remained closed. At some point, Berwind shared one-half of its interest with an outside investor.[4] Reitz was a signatory to the 1950 NBCWA and its amendments and to the 1968, 1971, 1974, 1978 and 1981 NBCWAs.

On September 30, 1984, Reitz closed all of its mines and ceased coal operations.[5]

*Prior Litigation*

On September 2, 1993, Berwind and three co-plaintiffs filed suit in the United States District Court for the Southern District of Indiana challenging under the Due Process and Takings Clauses the constitutionality of the assignment of liability to them for Combined Fund beneficiaries under the Coal Act. (*"Berwind I"*). They sought a declaration that the Act was unconstitutional as applied to them and an injunction to bar enforcement of the statute against them.

On April 4, 1995, the District Court rejected that constitutional challenge and granted the cross-motions for summary judgment of defendant Donna Shalala, Secretary of Health and Human Services, and of intervenor-defendants, the Combined Fund and its Trustees. *See Templeton Coal Co., Inc. v. Shalala,* 882 F.Supp. 799 (1995). After consolidating the *Berwind I* appeal with that of Davon, Inc., the Seventh Circuit affirmed and the Supreme Court denied certiorari. *See Davon, Inc. v. Shalala,* 75 F.3d 1114 (7th Cir.), *cert. denied,* 519 U.S. 808, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996).[6]

*Eastern Enterprises*

Two years after denying certiorari in *Berwind I,* the Supreme Court entertained a challenge to the constitutionality of the Coal Act as applied to another petitioner. *See Eastern Enterprises v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998).

While conducting coal mining operations, Eastern Enterprises ("Eastern") signed every NBCWA between 1947 and 1964. In 1965, Eastern transferred its coal operations to a wholly owned subsidiary, Eastern Associated Coal Corporation ("EACC"). From 1966 to 1987, Eastern effectively ran EACC with which it shared officers and supervising management. Eastern received 100% of EACC's $100 million in dividends. As EACC directors, Eastern officials ratified post–1965 bargaining agreements. Eastern retained its interest in EACC until 1987 when it was sold to an independent company.

Pursuant to § 9706(a)(3), The Commissioner assigned responsibility to Eastern

---

**4.** The name "Reitz" was used by three entities between 1963 to 1999. A detailed history of the company is set forth in the uncontroverted affidavit of Bruce Reed submitted with plaintiff's summary judgment motion. Except for the facts regarding Reitz set forth in the body of the memorandum, no party has suggested that the history of Reitz has any significance to the instant action.

**5.** Of the 1,209 Combined Fund beneficiaries assigned to Berwind, five worked for Reitz. Berwind is challenging only the assignment to it of beneficiaries who worked for it prior to

its leaving the coal business in 1962. In its words, "Berwind does not and never has challenged its joint and several liability for Reitz's premiums."

**6.** Neither the District nor Circuit Court discussed the related person provision. The District Court did not mention Reitz in its opinion. The Seventh Circuit briefly mentioned it in a one paragraph factual discussion of Berwind. Both Courts relied solely on Berwind's own activities in upholding the constitutionality of the Act as applied to Berwind.

for Combined Fund beneficiaries it had employed prior to 1966 based on its status as the pre–1978 signatory operator for whom the miners had worked the longest. The Court specifically noted that Eastern's assigned liability under the Act "bears no relationship to its ownership of EACC" as it was assigned responsibility for benefits "relating to miners that Eastern itself, not EACC, employed." *Id.* at 2149–50.

Based on the retroactivity of the statute, a majority of the Court struck down the law as applied to Eastern. The four-justice plurality held that application of the Coal Act to Eastern amounted to an unconstitutional taking. The plurality held that Eastern could not constitutionally be required on the basis of its activities decades earlier to bear the economic burden of funding lifetime health benefits it never promised and reasonably could not have contemplated. Justice Kennedy, who provided the fifth vote striking down the application of the Act, concluded that the Coal Act as applied to Eastern was impermissibly retroactive as Eastern was not responsible for the beneficiaries' expectations of lifetime benefits or for the perilous condition of the 1950 and 1974 Plans. The decision was handed down on June 25, 1998.[7]

### Action of the Commissioner

On September 24, 1998, the Commissioner decided to void the assignments of beneficiaries to operators similarly situated to Eastern. The Commissioner determined that 113 operators were so situated and qualified for such relief. These included Berwind's co-plaintiffs in *Berwind I*. It was also decided no beneficiaries would be assigned to another eleven similarly situated companies which had not received assignments. Each company whose assignments were voided had ceased to be a signatory to a UMWA agreement prior to the 1974 NBCWA.

Berwind ceased making premium payments after June 1998 and wrote to the Commissioner on July 15, 1998 requesting that its assignments be voided. Plaintiff sent a follow-up letter to the Counsel to the Commissioner on August 21, 1998, including more detailed information regarding the similarity between Berwind and Eastern. The Commissioner declined to void Berwind's assignments.

### IV. *Discussion*

#### A. *Plaintiff's Declaratory Judgment Claims*

1. *Berwind's Identity to Eastern Enterprises*

*Eastern Enterprises* requires a finding that the Coal Act is unconstitutional as applied to another company if that company "stand[s] in a substantially identical position to Eastern Enterprises with respect to both the plurality and Justice Kennedy's concurrence." *Anker Energy Corp. v. Consolidation Coal Co.,* 177 F.3d 161, 170 (3d Cir.1999); *Unity Real Estate Co. v. Hudson,* 178 F.3d 649, 659 (3d Cir. 1999).

The Supreme Court in *Eastern Enterprises* emphasized that Eastern had ceased mining coal decades prior to enactment of the Coal Act, had not signed the 1974 or any later NBCWA and was not responsible for the beneficiaries' expectations of lifetime benefits. As forcefully noted by plaintiff, it left the coal business before Eastern and also never signed the 1974 or any later NBCWA.

In *Unity Real Estate,* the Third Circuit upheld the constitutionality of the Coal Act as applied to Unity. Unity was assigned beneficiaries pursuant to § 9706(a)(1) or (a)(2) as a related person to several coal mining companies which it absorbed. These companies signed various NBCWAs throughout the 1960s and 1970s, including the 1974 and 1978 NBCWAs. The Court

---

**7.** Following *Eastern Enterprises,* the Third Circuit opined that a majority of the Supreme Court would find unconstitutional an application of the Act to a company that had not

agreed to the 1974 or a later NBCWA. *See Anker Energy Corp. v. Consolidation Coal Co.,* 177 F.3d 161, 172 (3d Cir.1999).

held that Unity was factually distinguishable from Eastern because Unity's assignments were based on employment of the beneficiaries by related companies which had promised to fund lifetime benefits. *See Unity,* 178 F.3d at 659.

In *Anker Energy,* the Third Circuit upheld the constitutionality of the Coal Act as applied to Anker. Anker was assigned liability for certain beneficiaries as a related person to King Knob Coal Company which was no longer in business. King Knob had agreed to be bound by the terms of the NBCWAs through "me too" agreements which it signed throughout the 1970s and until 1984.[8] As a related person to King Knob, Anker was assigned liability for King Knob's retirees. As Anker was assigned liability based on its relation to King Kob, a 1974 and later NBCWA signatory, the Court held that Anker was not in a substantially identical position to Eastern Enterprises. *See Anker,* 177 F.3d at 172.

As noted, Eastern did not sign the 1974 or any later NBCWA and ceased its coal operations in 1965 when it transferred them to a wholly owned subsidiary, EACC. Eastern retained its interest in EACC until 1987. The Commissioner assigned beneficiaries to Eastern pursuant to § 9706(a)(3) based solely on its own coal operations. Only retirees who had worked directly for Eastern prior to 1966 were assigned to it. It was this assignment that the Supreme Court deemed unconstitutional.

Plaintiffs in *Unity* and *Anker* were assigned beneficiaries who worked for related companies which had signed the 1974 or later NBCWAs. As related persons, Unity and Anker were responsible for the funding of *those* workers' benefits. Unity and Anker were thus not in a substantially identical position to Eastern.

Like Eastern, Berwind challenges assignments of beneficiaries based solely on its own coal operations and roster of employees 30 or more years before the Coal Act was enacted. Like Eastern, Berwind did not sign the 1974 or any later NBCWA promising lifetime benefits. Berwind ceased mining coal in 1962, three years prior to Eastern. Like Eastern, Berwind was not responsible for its workers' expectations of lifetime benefits or for the perilous condition of the 1950 and 1974 Funds. Like Berwind, Eastern maintained an interest in coal mining through a subsidiary which signed the 1974 and later NBCWAs.

The only distinction between the two is that Eastern no longer had an interest in its subsidiary on July 20, 1992 and thus was not a "related person" under the Act, while Berwind is a related person to Reitz. In colloquial terms, the issue then is whether this is a distinction with a difference.

A majority of the Supreme Court refused for constitutional purposes to impute to Eastern the promise of benefits made by EACC in agreements executed by Eastern officers as directors of EACC. Defendants suggest that such a promise nevertheless may be imputed by operation of the related person provisions.

█ Defendants essentially argue that plaintiff could have been assigned related person liability for its own employees and thus "it makes no difference as a constitutional matter that Berwind has been assessed those premiums directly" under § 9706(a)(3). The gist of the argument is that Berwind's employees are deemed to be employees of Reitz by virtue of § 9706(b)(1)(A) and thus assignable to Reitz and thus assignable back to Berwind as a related person to Reitz. This argument does not withstand scrutiny.

The court's view that Reitz's status as a signatory to the agreements promising lifetime benefits cannot be imputed to Berwind is fortified by the Social Security Administration's own reading of the Act.

---

**8.** A "me too" agreement is an agreement between an employer who is not a NBCWA signatory and the UMWA by which the employer agreed to be bound by the terms of the NBCWAs.

In providing guidance to an official responsible for designations in its Southeastern Program Service Center, the Administration stated in August 1994 that "[t]he Coal Act does not permit us to impute a related company's signatory status to that of the signatory operator; that is, a pre–1978 signatory cannot be treated as a 1978 (or later) signatory."

Beneficiaries may be assigned under § 9706(a)(1) or (a)(2) only to a 1978 signatory for which they worked or a related person to the signatory. A Berwind employee does not become an employee of Reitz by virtue of § 9706(b)(1)(A). That subsection does not literally impute employment by one employer to another. As its title reflects, it merely aggregates discrete periods of employment by different employers in calculating an employee's length of service for purposes of assignment. That a beneficiary may be assigned to an eligible assignee based in part on a period of employment by a related person does not literally make the beneficiary an employee of the assignee for the term of his employment with the related person.

The Commissioner thus could not assign to plaintiff beneficiaries under § 9706(a)(1) or (a)(2) based on their employment by plaintiff, a non–1978 signatory, or based on plaintiff's relation to Reitz which never employed them. Interestingly, the Commissioner in fact did not do so.[9]

Like Eastern, plaintiff was directly assigned under § 9706(a)(3) beneficiaries who had worked for it. The challenged

9. Since Reitz ceased being in business, of course, no Berwind employee could be assigned to Reitz for theoretical assignment back to Berwind even under the defendants' reasoning.

10. As Eastern had not been assigned 1992 Plan beneficiaries, there is no specific reference to that Plan in *Eastern Enterprises*. The Combined Fund and the 1992 Plan are part of the same statutory scheme and assignment of beneficiaries is made in the same manner. Substantial identity to Eastern exists when the factors which led the plurality and Justice Kennedy to conclude that assignment to Eastern of its retirees was unconstitutional are

assignments were not and could not have been made on the basis of plaintiff's related person status. The Court thus cannot conscientiously differentiate between Eastern and Berwind on that basis. The only way plaintiff could be liable for premiums for its own former employees is by assignment via § 9706(a)(3). As to such assignments, Berwind stands in a substantially identical position to Eastern.[10] This, however, does not dispose of the matter.

2. *Preclusion of Plaintiff's Constitutional Claims*

Defendants assert that even if plaintiff and Eastern are substantially identical in their position, Berwind is nevertheless barred by preclusion principles from maintaining its claims.

 The doctrine of res judicata or claim preclusion promotes finality, certainty and judicial efficiency by barring relitigation of claims. See *Gregory v. Chehi*, 843 F.2d 111, 116 (3d Cir.1988). The preclusive effects of a federal court decision on a federal question are controlled in any subsequent federal court litigation by federal law. See *Burlington Northern Railroad Co. v. Hyundai Merchant Marine Co., Ltd.*, 63 F.3d 1227, 1231 (3d Cir.1995); *Primo v. Sinclair*, 1992 WL 185580, *1 (E.D.Pa. July 22, 1992); 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4466 (1981).

 The doctrine prevents a party from relitigating causes of action which

present. Defendants have presented no principled basis for excluding 1992 Plan assignments from the reach of *Eastern Enterprises* when they are made in precisely the manner as Combined Fund assignments held constitutionally deficient. The Supreme Court did not rely on anything particular to the Combined Fund. The decision did not turn on the particular configuration or administrative segmentation of the health benefit program, but on the rationale for requiring an operator to pay benefits. What the court concluded was that an operator could not be forced to keep a promise of benefits it did not make and reasonably could not contemplate based on its activities decades before.

were or could have been raised and decided in a prior suit. *See Churchill v. Star Enters.*, 183 F.3d 184, 194 (3d Cir.1999); *United States v. Athlone Indus., Inc.*, 746 F.2d 977, 983 n. 4 (3d Cir.1984). To demonstrate claim preclusion under federal law, a defendant must show that there has been a final judgment on the merits in a prior suit involving the same parties or their privies and a subsequent suit based on the same cause of action. *Lubrizol Corp. v. Exxon Corp.*, 929 F.2d 960, 963 (3d Cir.1991); *Athlone Indus.*, 746 F.2d at 983. Application of the principles of claim preclusion "is not altered by the fact that the judgment may have been wrong or rested on a legal principle subsequently overruled in another case." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981). *See also Barzin v. Selective Service Local Bd. No. 14*, 446 F.2d 1382, 1383 (3d Cir. 1971).

■ The grant of summary judgment in *Berwind I* is a final judgment on the merits. *See Hubicki v. ACF Industries, Inc.*, 484 F.2d 519, 524 (3d Cir.1973); *Williams v. Lehigh County Dept. of Corrections*, 19 F.Supp.2d 409, 411 (E.D.Pa.1998).

■ Privity exists where a party adequately represented the nonparties' interests in the prior proceeding. *See Martin v. Wilks*, 490 U.S. 755, 761 n. 2, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989)(a nonparty may be bound if his interests are "adequately represented by someone with the same interest who is a party"); *Gambocz v. Yelencsics*, 468 F.2d 837, 841 (3d Cir. 1972)(res judicata bars second action as to defendants who were not parties to first action when there is close or significant relationship between them and defendants who were parties); *Williams v. City of Allentown*, 25 F.Supp.2d 599, 603 (E.D.Pa. 1998)(a losing party may not again bring essentially the same cause of action against identical or closely related parties); *Gambrell v. Hess*, 777 F.Supp. 375, 381–82 (D.N.J.1991)(plaintiff cannot relitigate same cause of action by substituting another defendant).

■ In *Berwind I*, plaintiff filed suit against Secretary Shalala, then in charge of assigning beneficiaries under the Coal Act. The Combined Benefit Fund and its trustees intervened as defendants. Berwind filed this suit against Kenneth Apfel as the official now responsible for assigning beneficiaries, the Combined Benefit Fund and its trustees, the 1992 Plan and its trustees and the United States. The United States, Commissioner Apfel and Secretary Shalala are in privity. It is under their authority that beneficiaries are assigned under the Act. They are jointly represented by the U.S. Department of Justice and have the same interest in upholding the statute and maximizing contributions. The interest of the 1992 Plan and its trustees in upholding the statute and maintaining Berwind's contributions were adequately represented by the Combined Benefit Fund and its Trustees, many of whom overlap. Indeed, the Combined Fund had an even greater incentive to defend as Berwind's assessed liability to the Combined Fund is substantially greater than to the 1992 Plan.

The parties to the present action or their privies were all parties in *Berwind I*.

■ Courts take a broad view of "cause of action." *Churchill*, 183 F.3d at 194. Two actions are generally deemed the same where there is an "essential similarity of the underlying events giving rise to the various legal claims." *Lubrizol Corp.*, 929 F.2d at 964; *Athlone Indus.*, 746 F.2d at 984. *See also In re Air Crash at Dallas/Ft. Worth Airport*, 861 F.2d 814, 816 (5th Cir.1988) (prior and subsequent claims are part of same "cause of action" if they arise from same nucleus of operative facts). The pertinent factors include the similarity of the alleged acts and material factual allegations in each suit and of the witnesses and documentation required to prove each claim. *See Lubrizol*, 929 F.2d at 963; *Athlone Indus.*, 746 F.2d at 984.

■ In *Berwind I* and the instant case, plaintiffs have challenged under the Tak-

ings and Due Process Clauses the assignment of beneficiaries under the Coal Act in an effort to defeat liability for assessed premiums. The alleged acts and material allegations are essentially the same as are the witnesses and documentation required to prove the respective claims.

In this case, Berwind challenges the propriety of the assignment of both Combined Fund and 1992 Plan beneficiaries. Plaintiff challenged only the assignment of Combined Fund beneficiaries in *Berwind I.* The requirement of an identity of causes of action refers not only to claims actually litigated, however, but also all claims arising out of the same underlying transactions or events which could have been litigated in the earlier proceeding. *Lubrizol Corp.*, 929 F.2d at 964; *Athlone Indus.*, 746 F.2d at 984. Claim preclusion bars any cause of action that a litigant asserted or could have asserted in the prior action. *See Huck v. Dawson,* 106 F.3d 45, 50 (3d Cir.1997) (even denial of motion to amend complaint in prior action does not prevent preclusion of claim that could have been pled in original complaint).

Berwind had been assigned liability for at least one 1992 Plan beneficiary in February 1993, prior to filing suit in *Berwind I,* and clearly was aware that additional assignments could be made. Berwind could have challenged the constitutionality of making 1992 Plan assignments to it in *Berwind I.* Berwind's claim that the Act should be declared unconstitutional in its entirety upon a determination that § 9706(a)(3) is unconstitutional as applied to Berwind and others similarly situated also clearly could have been asserted in *Berwind I.*[11]

Plaintiff's declaratory judgment claims constitute the same causes of action. The alleged wrong for which redress was sought in both actions is the imposition of liability on plaintiff under the Coal Act in violation of the Due Process and Takings

Clauses of the 5th Amendment. *See Athlone Indus.*, 746 F.2d at 984 (what is pertinent is whether wrong for which redress is sought is the same and not whether plaintiff seeks different relief). Plaintiff in *Berwind I* sought a declaration that any assignment under § 9706(a)(3) to Berwind of its retirees was unconstitutional. Had Berwind prevailed, it effectively would have received the relief is seeks in this case.

That plaintiff's declaratory judgment claims per se are precluded does not, however, necessarily preclude relitigation of the issue of the constitutionality of assignments to plaintiff in the wake of *Eastern Enterprises* in any new cause of action. This is determined by application of principles of issue preclusion.

Plaintiff's APA and recoupment claims are new causes of action. The APA claim is based on an agency action undertaken on September 24, 1998 and thus could not have been litigated in *Berwind I.* The assessment of premiums for each plan year gives rise to a new cause of action with regard to the propriety of that assessment. *See Comm'r of Internal Revenue v. Sunnen,* 333 U.S. 591, 598, 68 S.Ct. 715, 92 L.Ed. 898 (1948); *Comm'r of Internal Revenue v. Thomas Flexible Coupling Co.,* 198 F.2d 350, 353 (3d Cir.1952).

### B. *Preclusion of the Issue of Constitutionality*

The doctrine of collateral estoppel or issue preclusion prevents the relitigation of issues of law or fact which have already been adjudicated on their merits, whether or not the subsequent suit is based on the same cause of action. *See Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)(collateral estoppel applies to issues of law); *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)(once issue is actually and necessarily determined by

---

**11.** It appears that the Eastern Enterprises litigation was initially predicated on the assignment of one Combined Fund beneficiary.

*See Eastern Enterprises v. Shalala,* 942 F.Supp. 684, 686 (D.Mass.1996).

court of competent jurisdiction, that determination is conclusive in subsequent suits based on different causes of action involving a party to the prior litigation); *Witkowski v. Welch,* 173 F.3d 192, 198 (3d Cir.1999). Under federal law, issue preclusion applies if the issue sought to be precluded is the same as that decided in the prior action; that issue was actually litigated; the resolution of that issue was determined by and essential to a valid and final judgment; and, the party against whom the doctrine is invoked had a full and fair opportunity to litigate the issue in the previous suit. *See Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 480–81, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); *In re Docteroff,* 133 F.3d 210, 214 (3d Cir. 1997); *Burlington Northern R.R. v. Hyundai Merchant Marine Co.,* 63 F.3d 1227, 1231–32 (3d Cir.1995); *Zinman v. Prudential Ins. Co. of America,* 909 F.Supp. 279, 282 (E.D.Pa.1995).

■ A material change in the law or development in the controlling legal principles may vitiate issue preclusion. *See Montana* 440 U.S. at 155, 99 S.Ct. 970 (application of collateral estoppel is not appropriate when "controlling facts or legal principles have changed significantly since the [prior] judgment"); *Sunnen,* 333 U.S. at 600, 68 S.Ct. 715 ("a judicial declaration intervening between the two proceedings may so change the legal atmosphere as to render the rule of collateral estoppel inapplicable"). Berwind is thus not barred from relitigating the issue of the constitutionality of the challenged assignments in prosecuting its APA and recoupment claims if the decision in *Eastern Enterprises* constitutes a significant change or development in the controlling legal principles or legal atmosphere.[12]

Courts have recognized as sufficiently significant changes an intervening judicial declaration, a modification or clarification

of legal principles as enunciated in intervening decisions and an alteration in a pertinent statutory interpretation. *See Sunnen,* 333 U.S. at 600–01, 68 S.Ct. 715; *Bingaman v. Department of Treasury,* 127 F.3d 1431, 1437–38 (Fed.Cir.1997)("a significant change in the 'legal atmosphere'— whether in the form of new legislation, a new court decision, or even a new administrative ruling—can justify a later court's refusal to give collateral estoppel effect to an earlier decision"); *Graphic Communications Int'l Union, Local 554 v. Salem–Gravure Div. of World Color Press, Inc.,* 843 F.2d 1490, 1493 (D.C.Cir.1988)(subsequent agency reinterpretation of statutory provision); *Del Rio Distrib., Inc. v. Adolph Coors Co.,* 589 F.2d 176, 179 (5th Cir.1979)(no preclusion for issue resolved according to precedent subsequently overruled by Supreme Court); *Texaco, Inc. v. United States,* 217 Ct.Cl. 416, 579 F.2d 614, 617 (1978) (intervening decision of Supreme Court); *Chicago and Illinois Midland Railway Co. v. Marsh,* 577 F.Supp. 798, 806 (C.D.Ill.1984) (intervening Supreme Court decision); *U.S. v. General Elec. Co.,* 358 F.Supp. 731, 741–42 (S.D.N.Y.1973) (significant change in Supreme Court antitrust doctrine).

*Eastern Enterprises* did not overrule or change Takings or Due Process jurisprudence. The plurality expressly stated that it was applying "factors that traditionally have informed our regulatory takings analysis," *Eastern Enterprises,* 118 S.Ct. at 2149, and Justice Kennedy stated that his opinion was based on "settled due process principles." *Eastern Enterprises,* 118 S.Ct. at 2158 (Kennedy, J., concurring).

■ Although there literally has been no change in the pertinent principles of constitutional law, the "legal atmosphere" has been dramatically altered as to companies in a substantially identical position to

---

12. While the Commissioner's action of September 24, 1998 was prompted by a decision based on a constitutional determination, resolution of plaintiff's APA claim does not literally require relitigation of constitutional issues. In the strictest sense it requires a determination of whether Berwind is positioned so like the 124 companies whose assignments were voided that it was irrational not to grant the same relief to it and concomitantly whether the Commissioner's view of Berwind's related person liability lacked a reasonable basis.

Eastern. *Eastern Enterprises* reflects a significant new application of legal principles to a set of facts. This intervening clarification of the constitutional rights of persons in Berwind's position constitutes a "sufficient change in the legal climate to render inapplicable in the instant proceeding the doctrine of collateral estoppel." *Sunnen*, 333 U.S. at 606, 68 S.Ct. 715.[13]

## C. Plaintiff's Administrative Procedure Act Claim

Once the Commissioner elected for equitable or practical reasons to vacate the assignment of Combined Fund beneficiaries to all companies who were similarly situated to Eastern, he must employ that standard and make each individual decision is a rational manner.[14]

■ The Commissioner's decision not to grant relief to Berwind and to assign additional beneficiaries to it is reviewable as a final agency action under the APA. *See* 5 U.S.C. § 704; *Dixie Fuel Company v. Commissioner of Social Security*, 171 F.3d 1052, 1058 (6th Cir.1999)(assignment of beneficiaries judicially reviewable under the APA); *Bellaire Corp. v. Shalala*, 995 F.Supp. 125, 145 (D.D.C.1997)("decision to assign beneficiaries to [a signatory or related person] pursuant to the Coal Act is a final agency decision and hence, reviewable under the APA"). A final agency decision may be set aside by the court if the decision was "arbitrary and capricious, an abuse of discretion, or not in accordance with the law." 5 U.S.C. § 706(2)(A).

■ A decision is arbitrary and capricious if it lacks a reasonable basis. *See Dewitt v. Penn–Del Directory Corp.*, 106 F.3d 514, 522 (3d Cir.1997). A decisionmaker abuses his discretion when he makes a decision that is arbitrary or irrational. *See In re Paoli Railroad Yard*

*PCB Litigation*, 113 F.3d 444, 453 (3d Cir.1997). A reviewing court must determine whether the agency articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made. *See Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

■ The explanation of the Commissioner for his action, as articulated in the federal defendants' motion for summary judgment, is that unlike Eastern, Berwind has a related person (Reitz) whose "status as a 1974 signatory is imputed to Berwind." This factual distinction has no rational connection to the choice to assign to Berwind beneficiaries who worked for it prior to June 1962 when it ceased coal operations. As noted, the related person provision had nothing to do with the challenged assignments to Berwind. That Berwind has a related person under the Coal Act does not rationally support a finding that Berwind agreed to pay lifetime benefits for its own retirees who Berwind employed prior to 1963.

To impute to Berwind a signature or a promise by Reitz twelve years after Berwind ceased its coal operations is inconsistent with the reasoning in *Eastern Enterprises* and is not reasonable in the wake of that decision. The promises made by Reitz in 1974 and thereafter were made to *its* employees and not to persons employed by Berwind prior to 1963.

There is no rational connection between the related person provision and the Commissioner's assignment to Berwind of beneficiaries who worked for it prior to its

---

**13.** The Commissioner did not appear to believe that *Berwind I* precludes post-*Eastern Enterprises* relief when he voided the assignments of beneficiaries to Berwind's co-plaintiffs in that case.

**14.** It appears that the Commissioner has not voided the assignments of 1992 Plan benefi-

ciaries and it is not clear from the record presented whether or not Berwind's letters of July 15, 1998 and August 21, 1998 requested such action. It is also unclear from the record presented whether the Commissioner voided his assignments effective September 24, 1998, the date of the *Eastern Enterprises* decision (June 25, 1998) or some earlier date.

cessation of operations in 1962. Berwind's mere status as a related person to Reitz is not a rational basis for deciding that Eastern and Berwind are not similarly situated or in a substantially identical position with regard to the assignment of such beneficiaries.

The decision to deny the relief requested by Berwind on the basis of its related person status vis-a-vis Reitz was arbitrary and capricious and an abuse of discretion.

#### D. *Plaintiff's Recoupment Claims*

##### 1. *Coal Act Claim*

■ Plaintiff cannot sustain its claim for a refund predicated on the Coal Act, 26 U.S.C. § 9706(f)(3).

Section 9706(f)(2) requires the Commissioner to conduct a review of an assignment if requested. Section 9706(f)(3) requires the Commissioner, if he determines after a review pursuant to paragraph (2) that there was an error, to notify the assigned operator and the Combined Fund trustees of that error and requires the trustees then to refund premiums paid. There is no allegation, however, that the Commissioner determined that the assignments challenged by Berwind were made in error. To the contrary, plaintiff alleges that the Commissioner declined to make such a determination.

Any determination by the Commissioner pursuant to § 9706(f)(2) or (f)(3) is "final." *See* 26 U.S.C. § 9706(f)(4). Any challenge to that decision had to be under the APA.

Section 9706(f)(6) which does provide for private civil actions is limited to suits between operators for indemnification or to enforce contractual arrangements. *See Eastern Enterprises*, 118 S.Ct. at 2150; *Anker*, 177 F.3d at 177.

##### 2. *ERISA Claim*

■ The Coal Act provides that § 4301 of ERISA shall apply to any claim arising out of obligations to pay any amount required by the Act. *See* 26 U.S.C. § 9721. Section 4301 of ERISA provides that a "plan fiduciary, employer, plan participant, or beneficiary, who is adversely affected by the act or omission of any party under this subtitle with respect to a multiemployer plan ... may bring an action for appropriate legal or equitable relief, or both." 29 U.S.C. § 1451. The phrase "under this subtitle" refers to Subtitle E, "Special Provisions for Multiemployer Plans." Thus, § 1451 creates a private cause of action under ERISA only for violations of 29 U.S.C. §§ 1381 through 1453. *See Steiner elec. Co. v. Central States, Southeast and Southwest Areas Pension Fund*, 1995 WL 399517, *6 (N.D.Ill. June 29, 1995).[15]

Berwind asserts that it is entitled to a refund pursuant to § 4221(d) of ERISA. That section provides for adjustments to payments made following the resolution of disputes through arbitration. There is no showing or allegation that the parties ever submitted this dispute to arbitration and this section is thus inapplicable.[16]

■ Plaintiff cannot maintain an action for a refund under § 1401(d). Moreover, none of the sections under which a cause of action may be maintained under § 1451 allows employers to recover overcontributions. Indeed, no ERISA provision provides for or implies such a cause of action. *See Plucinski v. I.A.M. Nat'l Pension Fund*, 875 F.2d 1052, 1055–56 (3d Cir. 1989). *See also Jamail, Inc. v. Carpenters Dist. Council of Houston Pension & Welfare Trusts*, 954 F.2d 299, 302 (5th Cir. 1992); *Kwatcher v. Massachusetts Service*

---

**15.** The United States cannot in any event be sued under ERISA as it has not waived sovereign immunity against ERISA claims. *See Shanbaum v. United States*, 32 F.3d 180, 182 (5th Cir.1994).

**16.** The section provides that "[p]ayments shall be made to an employer in accordance with the determinations made under this part until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination." 29 U.S.C. § 1401(d).

*Employees Pension Fund,* 879 F.2d 957, 964 (1st Cir.1989).

■ If "a contribution or payment is made by an employer to a multiemployer plan by a mistake of fact or law," ERISA "does not prohibit the return of such contribution or payment to the employer." 29 U.S.C. § 1103(c)(2)(A)(ii). This section, however, "neither requires such refunds to be made nor provides employers a right of action against the fund if such refunds are not made." *Plucinski,* 875 F.2d at 1055.

### 3. Restitution Claim

■ Courts have resorted to federal common law to fill the interstices in ERISA. An employer can maintain an equitable cause of action for the recovery of payments erroneously paid due to a mistake of fact or law. *See Luby v. Teamsters Health, Welfare, and Pension Trust Funds,* 944 F.2d 1176, 1186 (3d Cir.1991); *Plucinski,* 875 F.2d at 1057.

■ An action for restitution requires the application of equitable principles and thus the court may deny recovery when it would be inequitable to grant it. *Plucinski,* 875 F.2d at 1058. An important factor in determining whether restitution is equitable is the financial impact such relief would have on the plan. *See Luby,* 944 F.2d at 1186; *Plucinski,* 875 F.2d at 1058. This and other equitable considerations cannot be assessed with any confidence from the record presented by the parties who have not even addressed this claim in the seven briefs filed among them.

### 4. Tax Refund Claim

The United States has waived sovereign immunity for "[a]ny civil action against the United States for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected." 28 U.S.C. § 1346(a)(1). Congress enacted a tax refund statute consistent therewith. *See* 26 U.S.C. § 7422.

No suit to recover a tax erroneously or illegally assessed or collected may be maintained, however, "until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulation of the Secretary established in pursuance thereof." 26 U.S.C. § 7422(a). No suit by a taxpayer "under § 7422(a) for the recovery of any internal revenue tax, penalty or other sum, shall be begun before the expiration of 6 months from the date of filing the claim required under such section unless the Secretary renders a decision thereon within that time." 26 U.S.C. § 6532(a).

Berwind filed refund claims with the IRS between July 24, 1998 and November 19, 1998 for all payments made to the Combined Fund between April 4, 1995 and June 30, 1998. The requisite six month period had not expired for any of these claims at the time this suit was filed, and only two had expired at the time Berwind filed its amended complaint. Each claim, however, has now been pending over six months. It would be pointless to require that plaintiff again amend its complaint to plead this fact when the government has taken a fixed position on the refund claims and no substantive rights would be affected.

■ A claim for a tax refund must be filed within two years from the time the tax was paid. *See* 26 U.S.C. § 6511(a). It appears from the schedule of requested refunds submitted by plaintiff that it filed timely refund claims only for premiums paid on and after August 22, 1996. Plaintiff's claim for a refund of premiums paid between April 1995 and July 1996 are barred. *See United States v. Dalm,* 494 U.S. 596, 602, 110 S.Ct. 1361, 108 L.Ed.2d 548 (1990) ("unless a claim for refund of a tax has been filed within the time limits imposed by § 6511(a), a suit for refund, regardless of whether the tax is alleged to have been 'erroneously,' 'illegally,' or 'wrongfully collected,' may not be maintained in any court").

■ The United States contends that plaintiff may not obtain a refund of any premium under the tax refund statute in

any event because the premiums are not taxes. The law of this Circuit is to the contrary. *See Unity*, 178 F.3d at 675 ("Coal Act obligations are taxes"). *See also Pittston Company v. United States*, 199 F.3d 694, 702–04 (4th Cir.1999) (Coal Act premiums are taxes subject to recovery from U.S. in tax refund action); *In re Chateaugay Corp.*, 53 F.3d 478 498 (2d Cir.1995).

### E. *The Trustees' Counterclaims*

Although the Combined Fund trustees were parties in *Berwind I* and *Eastern Enterprises*, preclusion is not an issue with regard to the Trustees' request for declaratory relief in Count I of the counterclaims.[17] For the reasons set forth in section IV.A.1 of this memorandum, the Trustees are not entitled to a declaration that the Coal Act has been constitutionally applied to plaintiff.

It follows that the Trustees also are not entitled to summary judgment on their counterclaims for premium payments in Counts II, III or IV with one caveat. It appears that plaintiff ceased making payments after June 25, 1998 even for the five assigned Combined Fund beneficiaries formerly employed by Reitz for whom plaintiff has acknowledged related person liability. If this is confirmed and the amounts owed are identified, the Trustees would be entitled to judgment on Counts II and IV with regard to those beneficiaries.

### V. *Conclusion*

Because plaintiff's claims for declaratory relief in Counts I, II and III are technically barred by claim preclusion principles, plaintiff's motion for partial summary judgment will be denied and the federal defendants' motion for summary judgment as to Counts I, II and III will be granted. Because plaintiff cannot sustain its claims for refunds under the Coal Act or ERISA, the federal defendants' motion for summary judgment will also be granted as to Counts IV and VII. Because plaintiff

stands in a substantially identical position as Eastern with regard to the assignment of its own former employees, the federal defendants' motion will be denied as to the claims in Counts V, VI and VIII. For the same reason, the Trustees' motion for summary judgment on their counterclaims will be denied, without prejudice to renew as to Counts II and IV with regard to any premiums owed by plaintiff for assigned beneficiaries formerly employed by Reitz.

An appropriate order will be entered.

### ORDER

**AND NOW**, this day of March, 2000, upon consideration of plaintiff's Motion for Partial Summary Judgment (Doc. # 13), the Motion of defendant Apfel and the United States for Summary Judgment (Doc. # 15) and the Motion of the United Mine Workers Combined Benefit Fund, 1992 Benefit Plant and their Trustees for Summary Judgment (Doc. # 16), consistent with the accompanying memorandum, **IT IS HEREBY ORDERED** that plaintiff's Motion is **DENIED**; the Motion of defendant Apfel and the United States is **GRANTED** as to plaintiff's claims in Counts I, II, III, IV and VII and is otherwise **DENIED**; and, the Motion of the United Mine Workers Combined Benefit Fund, 1992 Benefit Plan and their Trustees is **DENIED**, without prejudice to renew as to Counts II and IV of their counterclaims with regard to any premiums owed by plaintiff for assigned beneficiaries formerly employed by Reitz Coal Company.

---

**17.** Plaintiff has not asserted preclusion of any kind in its answer to Count I. *See* Fed.R.Civ.P. 8(c).